Thank you, Your Honor. May it please the Court, Andrew Azami from the Denton's firm, on behalf of Appellant EHealthline.com, or EHL for shorthand, I would like to reserve five minutes for rebuttal. There are two orders appealed. First, the District Court's order finding that it lacked personal jurisdiction over defendants Pharmaniaga Berhad and Modern Industrial Investment Holding Group Company. Second, the District Court's order awarding Pharmaniaga attorney's fees under the trade secret statutes. I'll address the jurisdiction point first, but I want to emphasize that while I believe the jurisdiction point is a closer call under the case law, I believe the attorney's fees award must be reversed under the applicable law, so I do want to save enough time to address that issue. Appellant EHL does not contend that defendants' contacts with California are sufficiently continuous or systematic as to give rise to general jurisdiction. Rather, it argues that the Court has specific jurisdiction because its claims arise out of defendants' contacts with California. The Ninth Circuit has said that whether specific jurisdiction exists is determined by a three-pronged test. The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its law. The second prong... As I understand, the non-disclosure agreements were negotiated with choice-of-law provisions away from California to other fora, either London for arbitration or to Singapore, I believe. Why does that not suggest that the parties did not wish to have California be the forum state for these interactions? Yes, thank you, Your Honor. I believe that if that were simply enough, despite the conduct that's alleged at issue... But if the forum clause in and of itself were enough to avoid personal jurisdiction in this forum, that would essentially give anyone who had made contacts with the forum a free pass based on a forum clause. And, you know, forum clauses are very common in commercial contracts. And here, I think that it goes beyond simply saying that there was a contract that was negotiated, which had, you know, abroad, which had a forum selection clause. I think here the allegations show that there was outreach by the defendants and appellants. For example, there was in-person meetings, and there were in-person meetings in the U.S., in California, in Sacramento, at EHL's headquarters. Also, as part of this tripartite agreement, and I don't dispute, Your Honor, you are correct that there is a forum selection clause. I mean, I can see that that is the case. But this contract was negotiated according to the way it's alleged in the complaint. There were negotiations occurring in the United States, in Sacramento. We had in-person meetings. Modern, one of the defendants, had a consultant that was based in Northern California that was working with it. Can I interrupt for a minute? I don't want to let your time run too much. You say you concede there's a forum selection clause, as you have to. I mean, there it is. Why doesn't this just plain old govern the case, irrespective of context? Obviously, someone can contract out of in-person jurisdiction by signing onto a forum selection clause. So, why does not the clause control this? Well, Your Honor, under this court's precedent, you know, in particular, the case Global Commodities Trading Group, which was the Ninth Circuit 2020 case, the site is 972F3-1101. In that case, the court said that you have to actually look at the entire course of conduct, the entire transaction history between the parties, the course of conduct between the parties, that you don't simply look at one myopic point. And here, I think that if the court were to rule that just this forum selection clause in and of itself would deprive the court of jurisdiction, then any party that enters into a commercial contract with forum selection clause is thereby, even if there is harm. Well, no, it depends on what the clause says. Well, I would argue, Your Honor, that a clause could be worded to require a foreign forum, but a defendant can still aim their conduct at the jurisdiction, knowing that the harm will be felt in the home jurisdiction. And here, I think that's… What was the nature of the consultant, Ms. O'Neill's, role in this? I understand she was employed by a subsidiary of Modern. But do you consider her to have been an agent of Modern itself? I do, Your Honor, and I do believe that that's how it's alleged in the complaint. And again, an allegation in the complaint on this ground, that any factual dispute needs to be construed in favor of the plaintiff asserting jurisdiction. And here, Modern's Ms. O'Neill was an agent because she was sourced to help find an investor who might be interested and might have the knowledge and the information that would support this tripartite agreement, which I acknowledge contemplated construction that would happen abroad, but that Ms. O'Neill worked for Modern and was seeking to find the United States investor to enter into this tripartite agreement, a participant, I'm sorry, in this tripartite agreement. And that's how Modern came to this tripartite agreement. And Modern was in Sacramento. It was meeting with Farman Yaga representatives. It was meeting with EHL at EHL's headquarters. Modern's representative was represented by Ms. O'Neill, its agent, as it's alleged in the complaint. And that occurred at Sacramento in at least two in-person meetings. In addition to the signing of the various agreements here, there's a memorandum of collaboration. There's a nondisclosure agreement that was entered into between the parties. And I see that my time is dissipating. And so I'd like to point out that some of the record sites, which I think support that the defendants directed their conduct against EHL in California and that they targeted EHL are in the record, I believe, at 3 ER 294 to 302, 306, 308 and 309, and 313 to 317. And I think if you look at those specific allegations, I think that this case, you know, while not on all fours with the court's 2020 decision in global commodities trading, I think there are certainly similarities. And there the court, the Ninth Circuit, you know, this court said that looking to the place of performance, the court looks to the business reality behind the particular contract that they had issued and emphasize that the need for a highly realistic approach that recognizes that a contract is ordinarily, but an intermediate step serving to tie up prior business negotiations with future consequences, which themselves are the real object of the business transaction. And that prior negotiations and contemplated future consequences along with the terms of the contract, but also the party's actual course of dealing must all be evaluated in determining whether the defendant purposefully established in their own context with the forum. And that was the court in global commodities trading at 972 F3rd at the Penn sites, 1110. But they were referring and citing and discussing the Burger King case from the Supreme Court. And so I think that this case, you know, although, again, not on all fours, I think most aligns with that case. And that's because there was not only this two day in-person meeting in Sacramento, California, at which representatives of both modern and farm and yoga personally attended. But there was also Miss O'Neill, modern's local representative based in California, which was there as who, which acted as a consultant on behalf of modern and had a California base, you know, societies. And I, although the telephones and emails by themselves, perhaps would not support personal jurisdiction here. There were over 50 telephone calls lasting over 75 hours, hundreds of emails in California, which I think combined with the in-person contacts and the presence of modern consultant, Miss O'Neill would would would fit within the court's precedent for personal jurisdiction, particularly, I think, as guided by by the global commodities trading case. I'd like to pivot to the attorney's fees issue because I do think it's very important here. Well, you are into your rebuttal time. Do you want to continue or you have four minutes left? Four and a half. Yeah, I'll take I'll just take two to two minutes just to outline this. I think it's an important issue. The attorney's fees. I think your award should be reversed for two independent reasons. First, it's facially defective. It fails to comply with Rule 54 of the federal rules of civil procedure. Here, the district court signed a proposed order provided by farm and yoga, summarily granting their feet their motion for fees, failing to provide any conclusions of law or findings of fact to support the award. And that that, I think, violates the plain language of Rule 54. Rule 54 D to see where that which requires the court to find facts, state conclusions of law as provided for in Rule 52. The second the second point, and then I'm going to stop here. The second point is that I believe that the district court's award is independently flawed because the filing of this complaining, it's farm and yoga does not come close to supporting the standard, which is objective speciousness of the claim and subjective bad faith in bringing the action. It's farm and yoga's burden to prove both of those prongs. And I don't believe that either of those prongs are fairly met here. There has never been a determination of the merits of this case. The ICC tribunal found a negative jurisdiction finding and the district court found it did not have jurisdiction over over farm and yoga or moderate. There's never been a merits ruling. And in my view, that does not come close to meeting the standard that's required to support attorneys fees on the trade secret statutes. And it would have a chilling effect if the court were to rule that this did. And with that, I will I will save the rest of my time for rebuttal. Thank you very much. Thank you. Thank you. May it please the court. Samir Degas and the defendant's farm and yoga farm and yoga is a Malaysian company which was approached by E.H.L. to engage in a joint venture in Saudi Arabia that has absolutely no connection with the United States. All of the alleged trade secrets, contracts and negotiations in this case center on Saudi Arabia. And far from availing itself of the benefits and protections of U.S. law. Farm and yoga did everything it could to structure its affairs away from the United States forum, including, as Your Honor pointed out, by inserting numerous contractual clauses that direct this case away from the U.S. The only connection this case has with the U.S. is the fortuity of the plaintiff's residence. And as this court explained in moral, that is not enough. And the only reason this case is in California at all is because E.H.L. all of the underlying trade secrets allocation. But that's a different argument, right? I mean, you're not arguing ratio, Dakota. We're arguing impersonal jurisdiction. That's correct, Your Honor. I mean, I think it goes to the attorney's fees issue. But just to give you the background of how we ended up in California. I understand the background is important, but that's not the issue. Yeah, absolutely, Judge Fletcher. But, you know, I think it is important to note for the purpose of the attorney's fees award that even on appeal, E.H.L. does not dispute that the purpose of this litigation was to estort Farman Yaga into giving up a facially valid award. And the district court, who is very familiar with this case and these parties, I think very correctly, issued an attorney's fees award on that basis. I'd just like to start on jurisdiction, though, and address a couple of the things we just heard. I think it's very telling that the lead case that they cite is global commodities trading, which is nothing like this case at all, Your Honor. I do think the important principle from global commodities trading is that you do have to analyze the course of dealing between the parties and figure out what the center of gravity of the dispute is. And, of course, in global commodities trading, there was a long, sustained relationship with the United States. You know, I think the language is, Bechoza sustained a relationship with Global over several years and hundreds of contracts, purchasing millions of dollars of goods to be shipped from the United States. The goods Bechoza purchased were graded according to American standards and inspection certificates were issued in California. Bechoza consistently made payments on contracts to Global in California. Well, Mr. Jacobson, wasn't the joint venture agreement contemplating a continuous, sustained business relationship between the three parties as well? I understand it was aborted, but that was not the intention at the time that the negotiations were occurring. But a sustained business relationship in Saudi Arabia. Everything about this case was a tripartite agreement in Saudi Arabia to build a manufacturing facility in Saudi Arabia, all of the alleged trade secrets related to Saudi Arabia, all of the negotiations and contracts contemplated in Saudi Arabia. Wait a minute. You say all the trade secrets related to Saudi Arabia? What do you mean by that? Well, as I understand it, the trade secrets here are all things about the Saudi market, the viability of the project, how the project was going to work, all of those sorts of things. So even the substance of the alleged trade secrets were things that were centered on Saudi Arabia. But the difficulty I have with that argument is the trade secrets were compiled in California, were they not? This was a California-based company that created this market research and compiled it there, and the allegation is that the trade secrets were misappropriated from California. So why isn't that enough to create more of a connection with the forum state itself and not have it be as fortuitous as you seem to think? I don't think the trade secrets were in any meaningful sense compiled in California, in the sense they don't have a connection to the forum. They're in EHL's mind, as they would be in the mind of any plaintiff, wherever that plaintiff was. But they weren't things that had to do with information gleaned from California that had any connection to California whatsoever. And then the substance of the trade secrets all had to do with Saudi Arabia. I mean, the complaint is a little bit unclear on exactly the content of the trade secrets. It's described as, I think, a kind of confusing level of generality. But all of the actual substance of what EHL was trying to provide was how is this project going to work in Saudi Arabia, how is it commercially viable, what are the permits you need, what are the markets going to be, and all of this. So everything has to do with Saudi Arabia. And the only connection to California at all is that happens to be where EHL resides. And I think, as this court said in Morrow, that can't be enough. If EHL resided anywhere in the world, it would be true that the trade secrets and negotiations, everything would be exactly the same. And what of the consultant in the Bay Area, Ms. O'Neill, and her relationship with this as a potential agent of Modern? Yeah, that's not an allegation as to Modern. We represent only Pharma Niagara. And so I honestly haven't thought that much about that specific aspect of the case. I do think Modern has not appeared in this case. Think about it now in the context of it's purported to be over a year's worth of negotiations. You have a Bay Area-based consultant as one of the defendants. There's a trip to Sacramento. EHL alleges that in that trip trade secrets were misappropriated. When you look holistically at all these allegations, doesn't it start to seem more than just a random, fortuitous, and attenuated connection to California? Well, I think the agent in California, to the extent that's Modern's agent, doesn't obviously show contact between Pharma Niagara. I think, obviously, if you have a presence in the State like that, I think that maybe makes a difference. As to the in-person meeting, I do think there are sort of a couple of things to note about the in-person meeting. The first is, as this Court said in Picot and Morrill, you know, a transitory presence within a forum alone is not enough to create a personal jurisdiction. This was only a short two-day meeting. It was at EHL's own insistence. And the meeting substantively had nothing to do with California. It all was about Saudi Arabia and the plant in Saudi Arabia. And I think — Well, it might have had nothing to do with California, but it had very much to do with the project at issue and, I guess, with the allegations of wrongdoing. That is to say that that's what this all comes out of, is this meeting and this relationship. So I don't think that's true, Your Honor. I think it's important to note that there is no — and, you know, the district court makes this finding, I think, at ER-21, which is that EHL did not allege in its complaint that any improprieties or deception occurred at that meeting. And so that meeting is two weeks or over two weeks before the MOC, and it's basically before any of the wrongful conduct is alleged. And I think if you look at, you know, ER-315 to 317 is probably the place where it describes this most. But the way in which it's really described is this meeting is basically a sales pitch where EHL really wants — you know, remember, this is — EHL initially reached out to And EHL really wants — essentially wants to sell itself and sell its product to Pharma Nyaga, and it says, please come have this meeting in California. Eventually, because there are already two employees already in the United States, they come for a meeting over the weekend that's shown this product. And then, you know, EHL alleges that Pharma Nyaga is favorably impressed. You know, they think it's great. They reproduce in the complaint an internal e-mail where these two Pharma Nyaga employees talk to their higher ups and say, you know, we think we should go ahead with the MOC. We think this is a good — this is a good product. And then two weeks later, they do conclude the MOC. It's only after the MOC is concluded that things allegedly go south. And — Well, can I ask — let me interject. As I understood it, the confidentiality agreements preceded the Sacramento meeting. So, you know, as it's alleged, the reason why that meeting took place was because EHL believed it was under the cloak of confidentiality in which it could release its purported trade secrets. Isn't that correct? That might be true, Your Honor. But the question is, was there any misappropriation of trade secrets or was there any wrongful acquisition of trade secrets? And it wasn't at that point. At that point, EHL was — I mean, there wasn't any point. But, you know, even if we're taking all of the allegations in the complaint, which, again, we don't have to do. It's a 12B2, and I can get into that as well. But even if you take all the allegations and the complaint is true, what's alleged is that at that point, EHL were just, you know, willingly giving information essentially to sell themselves to Farman Yaga. And at that point, Farman Yaga was fully on board, was interested in the project, was not doing anything wrongful, had not formed any intent to, you know, dupe or steal or anything like that. None of that is alleged at all in the complaint. There's one conclusory allegation that says it's cloaked with deception, but we don't know what that means. And it's clear from their own allegations, you know, that what Farman Yaga did at that point was then, you know, continue on with the relationship, sign the MOC as a result of that meeting. So at that point, there's no misappropriation, no wrongful conduct. They're just receiving information as part of a business relationship. It's only after the MOC is signed that they allegedly then go and misappropriate the trade secrets in Saudi Arabia. And it all has to do then with Saudi Arabia. It's the only connection with the United States, which is this short two-person meeting, which – sorry – this short, you know, two-day meeting, which I'm not sure is enough in any event, doesn't even involve any of the tortious conduct. Even if it did involve some tortious conduct, though, I think under this Court's decision, moral, that would not be enough. In moral, there was, you know, you know, calls and e-mails, all that kind of stuff. There was travel to the jurisdiction. There was even the initiation of legal process. The central allegation there was that there was an abusive process tort based on filing a harassing lawsuit in Arizona. And this Court said even that is not necessarily enough because it's only ancillary to what the primary issue was, which was the Nevada litigation. And that sort of goes back, I think, to the line in Global Commodities Trading about how you have to look to the center of gravity of the dispute and analyze it in the context of the entire course of dealing between the parties. This was always an arrangement that had everything to do with Saudi Arabia. You have an entity like Farmaniaga that structured its affairs to avoid entanglement in the U.S. forum in every single conceivable way. And the only thing that the only connection here is the fortuity of the plaintiff's residence. And I guess this two-day meeting, which no tortious activity was alleged to be to have occurred. That, I think, under this Court's precedent, and I think under moral, is a fortiori not enough. You know, if you look at the briefs in moral, it's all the same arguments about the Calder effects test and how, you know, the plaintiff's residence is significant and the injury of the plaintiff in the forum and all of that. But that is not enough under this Court's precedent and under the sort of post-Walden case law. Let me go back to Global Commodities because in that case it was agriculture related to an export of agricultural products to, I think, Central America, to Honduras. It was not based on business activities within, I guess, in California itself. But there we found that there were substantial negotiations that were remote, right, and maybe only one or two actual meetings itself in-state. But looking holistically at the entire course of the negotiations and the business relationship, personal jurisdiction was found. So why isn't this a more analogous situation to that? Even if there are business relationships that are contemplated in another country, in Saudi Arabia, there's a course of negotiation that's occurring within-state and with a California party. But I think the central thing in Global Commodities Trading, as I sort of describe in that quote, is the business relationship was centered on the United States. So that was an entity that was trying to avail themselves of U.S. markets and so clearly had a forum connection that was not based on the mere fortuity of where the plaintiff happens to reside. And I think it's very hard to give any meaning to that language in moral and in this Court's post-Walden cases if in this case you would still find jurisdiction because there is really no forum connection at all other than the plaintiff's residence here. And the only, you know, even this meeting, as I said, no tortious activity occurred. But even then, it only occurred in California because that's where EHL happened to reside. You know, all of the, you know, and I think it's a common-sense inquiry. I really do think that. And I do think it's, you know, as this Court said and as the Supreme Court said in Burger King, it's not meant to be mechanical. You sort of have to look at it in a holistic way. And I do think the sort of central guideposts are look at the course of dealing and try to figure out what is this dispute really about. This dispute is about the misappropriation of trade secrets in Saudi Arabia. This is an entity that has never contemplated any relationship with the U.S., never wants to avail itself of U.S. markets, didn't even want to deposit any funds in the U.S. You know, it's hard to imagine a defendant that tries to do more to avoid entanglement in U.S. law. And I think it ends up being true that if you say that even if an entity like that is subject to personal jurisdiction, it's hard to imagine companies, you know, any kind of commerce with a U.S. company, because it's sort of as soon as you even have a little bit of communication, you end up being entangled in U.S. law. And I think the calls and e-mails aspect, I mean, this Court said in In Re Boon, ordinarily the use of mails, telephone or other international communications simply do not qualify as purposeful activity invoking the benefits and protections of the forum state. So that's a sort of venerable line of case that goes back over 20 years. So I think it would be a bit of a sea change to say calls and e-mails are enough. I think especially in the context of this where you have far less informed activity than in moral. You have less than two minutes. Do you want to turn to the attorneys' fees issue? Absolutely, Your Honor. I think just a quick couple of points to make about that. The first is I don't think that plaintiffs ultimately dispute in their briefing that this case was brought for an extortionate purpose. You know, they call it tough negotiating. But, you know, this Court has said in numerous cases, including, for example, in Fink v. Gomez, that bad faith can be inferred when the ---- Wait a minute. You say they do not dispute that it was brought for extortionate purposes? Well, they do not. They wanted money, but I'm not sure they would call it extortionate. You would. Right. I don't say not use the word extortionate. I think that they would not dispute that they brought this lawsuit because they wanted us to drop the enforcement action. This was brought two years after the conclusion of the arbitral proceedings. So it wasn't sort of an independent desire to bring this claim. They brought it only after we sought enforcement, only after they had refused to pay the arbitral judgment, and after threatening and writing that if you don't drop the arbitration enforcement action, we're going to bring this lawsuit. And so, you know, they call that tough negotiating. But, you know, that is, I think, that is subjective bad faith, this Court said in Fink v. It's pretty difficult to ask us to infer from the record that this is a sham lawsuit without any findings of fact or conclusions of law by the district court, isn't it? I think that's correct, Your Honor. And obviously, one option is just to remand back to the district court for that. I mean, we've explained in our briefs the Court doesn't have to do that. You know, in fact, in the Swanson v. Levy case, which is the case that they cite on page 15 of their brief, the Court says failure to make the necessary findings does not require remand if a complete understanding of the issues may be had without aid of separate findings. We think a complete understanding can be had on these facts. But certainly, if you do, then I think the appropriate course is obviously to remand. I think it's important to know that the appropriate course in that situation would not be to reverse the finding of attorney's fees because, you know, I think that there is substantial evidence in the record that it was warranted. It's obviously a discretionary decision. There's no reason to think it was an abuse of discretion. But if you think there wasn't proper compliance with Rule 54, then I think the appropriate course would be to remand. Okay. Thank you. Thank you, Your Honor. Briefly, EHL is not in Saudi Arabia. Its trade secrets were housed and solicited in California, not Saudi Arabia. Negotiations occurred in Sacramento. Pharma Nyaga is not in Saudi Arabia. They knew EHL was in Sacramento. They flew representatives personally to California to meet with EHL at its Sacramento headquarters. Modern had its consultant based in California. And the complaint alleges an ongoing lengthy negotiation. Does it make a difference that the Pharma Janna representatives came at the invitation or maybe even insistence of EHL? I mean, they did not come and solicit your business. They came because you were soliciting and asked them to come. Does that make a difference? Well, I think that if you look at global commodities, the answer to your question, Your Honor, is I think it's a relevant consideration. But I think that you have to look at the entire course of dealing. In global commodities, the business was to occur in Honduras. But the court emphasized, for example, that, for example, payment occurred in the United States and that there was a course of dealing. And where did Pharma Janna and Modern believe that payment would occur? They entered into nondisclosure agreements and an MOC under which confidential information would be exchanged. Where did they think the confidential information that EHL had was coming from? I think that the fact that EHL might have been involved in a negotiation that, in part, included negotiations in the course of dealing contemplated the United States does not by itself mean that they, therefore, do not have personal jurisdiction if they have their trade secrets misappropriated from them, which is what it's alleged in the complaint. And then just very briefly, I'll respond on the attorney's fees point. I think the quotes use extortionate purpose. No, EHL does not concede that. And I think perhaps had there been some merits-based finding against EHL, and yet EHL, in other words, its claim for trade secrets misappropriation had been denied on the merits, and it had nonetheless prosecuted a lawsuit in the hope of somehow having leverage, maybe then you could say that. But that has not occurred. There's never been a merits-based finding that goes outside of just jurisdiction on this case. Well, there's never been a merits-based finding in this suit. You had a merits-based finding in the London arbitration in which the arbitrators were actually really scathing as to the behavior of your clients. But the ruling was that they did not have jurisdiction to decide contract claims or the trade secrets claim. And with that, justices, your honors, I'll submit. Thank you. Thank you very much. Okay. We will call our next case.
judges: WALLACE, FLETCHER, SANCHEZ